**DELAWARE COCA–COLA BOTTLING COMPANY, INC.**

**v.**

**GENERAL TEAMSTER LOCAL UNION 326 and Eastern Conference of Teamsters, General Teamster Local Union 326, Appellant.**

No. 79–2169.

United States Court of Appeals, Third Circuit.

Argued Feb. 20, 1980.

Decided June 25, 1980.

Rosenn, Circuit Judge, concurred and filed opinion.

Sheldon N. Sandler (argued), Bader, Dorsey & Kreshtool, Wilmington, Del., for appellant.

Richard G. Elliott, Jr., Richards, Layton & Finger, Wilmington, Del., Michael G. Tanner (argued), Hamilton & Bowden, of counsel, Jacksonville, Fla., for appellee.

Before SEITZ, Chief Judge, ROSENN, Circuit Judge, and SHAPIRO, District Judge.*

## OPINION OF THE COURT

SEITZ, Chief Judge.

General Teamster Local 326 (the Union) appeals from a final judgment entered in favor of Delaware Coca-Cola Bottling Co. (the Employer) awarding damages under § 301 of the Labor Management Relations Act, 29 U.S.C. § 185 (1976), for a strike at the Employer's Wilmington, Delaware, plant.

### I.

The Employer is engaged in the business of producing and selling soft drinks. In November of 1975, the Union was certified as the collective bargaining representative for the production and maintenance employees and the drivers at the Employer's Wilmington plant. Following certification, the Union and the Employer commenced negotiating a contract.

In the spring of 1976, the Union and the Employer reached an agreement as to the production and maintenance employees and signed a collective bargaining agreement that went into effect on June 1, 1976, and that was to remain in effect until 1979. Articles 14 and 15 of the contract established grievance and arbitration procedures. Section 1 of Article 14 defined a grievance as "a dispute or complaint arising between the parties hereto under or out of this Agreement, or the interpretation, application, performance, termination, or any alleged breach thereof." Any such grievance would be processed through a three-step procedure, which, if no resolution was reached, would lead to arbitration under Article 15.

Article 16, which is the subject of the dispute here, is a no-strike clause. It provides:

Section 1. The Union will not cause nor will any member of the bargaining unit take part in any strike, sit-down, stay-in, slow down in any operation of the Company or any curtailment of work or restriction of service or interference with the operation of the Company or any picketing or patrolling during the term of this Agreement.

Section 2. The Company shall have the right to discipline up to and including

* The Honorable Norma L. Shapiro, United States District Judge for the Eastern District of Pennsylvania, sitting by designation.

discharge of any employee who instigates or gives leadership to, or participates in any strike or work slow-down or curtailment of work during the term of this Agreement. Any disciplinary action meted out or imposed by the Company hereunder shall be subject to the grievance procedure of this Agreement, including arbitration.

Section 3. The provisions of this Article, other than as mentioned above, shall not be subject to grievance or arbitration, for the purpose of assessing damages or securing specific performance, or any other matter, such matters of law being determinable and enforceable in the courts.

After the signing of the contract, negotiations over the drivers continued for approximately one month. These negotiations stopped on July 9, 1976, because the Employer had decided to engage Countrywide Personnel to supply it with drivers. The Employer transferred all its drivers to Countrywide, and the Union negotiated a collective bargaining agreement with Countrywide.

On March 22, 1977, the Employer terminated its relationship with Countrywide, and the drivers once again became employees of the Employer. The next day, the president of the local called a one-day strike of both the production and maintenance employees and the drivers. The Employer and the Union then once again began negotiations concerning a collective bargaining agreement for the drivers.

On July 19, 1977, no agreement having been reached, the drivers set up a picket line at the plant. Although the production and maintenance employees reported for work that morning, they refused to cross the picket line. This occurred each day for nine days until on the afternoon of the 27th the Union ordered the production and maintenance employees to return to work. The drivers continued to picket until August 12, when they returned to work.

The Employer filed this suit in district court under § 301 of the National Labor Relations Act claiming that the nine-day work stoppage by the production and main-

tenance employees violated the no-strike clause in the 1976 collective bargaining agreement. After a non-jury trial, the court concluded that the work stoppage was a sympathy strike and that the no-strike clause waived the production and maintenance employees' right to sympathy strike. The court awarded damages of $67,922.85 plus interest, and this appeal followed.

## II.

### A.

■ We start with the proposition that the right of employees to engage in sympathy strikes is protected under the National Labor Relations Act. Yet this right can be waived in a collective bargaining agreement. *See NLRB v. Rockaway News Supply Co.*, 345 U.S. 71, 73 S.Ct. 519, 97 L.Ed. 832 (1953). In addition, the Union here has not challenged the district court's finding that the Union authorized the sympathy strike. *Cf. Carbon Fuel Co. v. UMW*, 444 U.S. 212, 100 S.Ct. 410, 62 L.Ed.2d 394 (1979) (union not liable for wildcat strike). Thus the question presented is whether by virtue of the terms of the 1976 contract the production and maintenance employees waived their right to refuse to cross the drivers' picket line.

The extent of the waiver in a collective bargaining agreement of the right to strike " 'turns upon the proper interpretation of the particular contract . . . [which] must be read as a whole and in light of the law relating to it when made.' " *Food Fair Stores, Inc. v. NLRB*, 491 F.2d 388, 395 (3d Cir. 1974), *quoting Mastro Plastics Corp. v. NLRB*, 350 U.S. 270, 279, 76 S.Ct. 349, 356, 100 L.Ed. 309 (1956). Moreover, we have held "that a waiver of a statutory right must be clearly and unmistakably established, and that express language will not be read expansively." *United Steelworkers v. NLRB*, 536 F.2d 550, 555 (3d Cir. 1976) (waiver of certain grievance procedures). *Accord, e. g., Gary Hobart Water Co. v. NLRB*, 511 F.2d 284, 287 (7th Cir.) (sympathy strike), *cert. denied*, 423 U.S. 925, 96 S.Ct. 269, 46 L.Ed.2d 252 (1975).

These waiver principles are complicated in the context of a sympathy strike because the union's no-strike obligation may be created in one of two ways: by implication from the arbitration clause or by an express clause in the contract. *See Gateway Coal Co. v. UMW*, 414 U.S. 368, 94 S.Ct. 629, 38 L.Ed.2d 583 (1974). In *United States Steel Corp. v. UMW* (*U.S. Steel II*), 548 F.2d 67 (3d Cir. 1976), *cert. denied*, 431 U.S. 968, 97 S.Ct. 2926, 53 L.Ed.2d 1063 (1977), U.S. Steel's employees refused to cross a picket line at another employer's plant. We held that the sympathy strike did not violate the implied no-strike obligation arising out of the arbitration clause in the collective bargaining agreement.

In *U.S. Steel II* we reserved the question of whether an express no-strike clause like we have here would waive the right to engage in a sympathy strike. Given that waiver turns on the facts of each case, implied and express no-strike obligations present different factual and analytical problems. Where the no-strike obligation is express in the contract, there are a number of facts relevant to whether the union intended to waive the right to engage in a sympathy strike that simply are not present in cases involving an implied no-strike obligation. For example, with an express clause, the court can determine its meaning by looking to the language of the clause, the structure of the contract, the bargaining history, and any other relevant conduct of the parties that shows their understanding of the contract. While we do not mean to suggest that this is an exclusive list, we feel that the factual nature of the waiver inquiry requires an examination of those factors in any case involving an express no-strike clause where there is no explicit reference in the contract to sympathy strikes.

## B.

Initially, we must consider whether the language of the no-strike clause itself waives the right to sympathy strike. The contract here contains a broad, general no-strike clause. As the district court correctly noted, there is no picket line clause,[1] nor does the contract expressly refer to sympathy strikes. Although the language is broad in the sense that it refers to "any strike," as in so many areas of labor law, seemingly express language may not be read out of the context of other legal principles. Several courts have concluded that a broad, general no-strike clause in and of itself is not a clear and unmistakable waiver of the right to sympathy strike. *E. g., NLRB v. C. K. Smith & Co.*, 569 F.2d 162 (1st Cir. 1977), *cert. denied*, 436 U.S. 957, 98 S.Ct. 3070, 57 L.Ed.2d 1122 (1978). We agree with that result for two reasons.

First, the rationale underlying *U.S. Steel II, supra*, leads us to the conclusion that general language, by itself, is not explicit enough to waive the right to sympathy strike. In that case, we relied on the notion of coterminous interpretation, an idea that grew up largely in the area of implied no-strike obligations. Coterminous interpretation means that if the subject matter of the strike is arbitrable, then the strike violates the no-strike clause. The theory underlying

---

1. The language in Article 16 that states "The Union will not cause . . . any picketing" is not a picket line clause. The term "picket line clause" refers to a clause that deals with the employees' right to refuse to cross picket lines, not the right to picket itself, with which Article 16 deals. Thus there is no picket line clause here as that term is normally used. For that reason, *W–I Canteen Service, Inc. v. NLRB*, 606 F.2d 738 (7th Cir. 1979), decided after the district court's decision and relied on heavily by the parties here, is distinguishable because it involved two picket line clauses. *See id.* at 745–46. The same is true of *Iowa Beef Processors, Inc. v. Amalgamated Meat Cutters*, 597 F.2d 1138 (8th Cir. 1979), where the supplement to the no-strike clause provided that the union would "promptly order its members to resume their normal duties notwithstanding the existence of any picket line." *Id.* at 1144. To the extent that other language in those opinions is inconsistent with our position, we decline to follow it.

Although the district court seemed to attach some significance to the absence of a picket line clause, we find none. A picket line clause could either preserve the right to refuse to cross picket lines or it could relinquish the right. The failure to specify one or the other cannot be determinative of waiver.

this is that the no-strike clause is a quid pro quo for the arbitration clause. *See generally Gateway Coal Co., supra.* In short, the obligation to not strike is read to be an obligation to not strike over arbitrable issues.

Applying these principles to the sympathy strike and the implied no-strike obligation in *U.S. Steel II*, we noted that with a sympathy strike, the subject matter of the strike is a dispute between the primary strikers and their employer and thus is not subject to arbitration between the sympathy strikers and their employer. In short, the strike is not *"over* any dispute" between the employer and the sympathy strikers. *See U.S. Steel II*, 548 F.2d at 73. Accordingly, we concluded in that case that because the subject matter of the strike was not arbitrable between the employer and the sympathy strikers, the sympathy strike did not violate the implied no-strike obligation.

We find this reasoning applicable where there is an express no-strike clause in the contract. The quid pro quo rationale underlying coterminous interpretation also applies where the union actually gives up its right to strike instead of having it implied from the arbitration clause. When faced with an express no-strike clause, the Supreme Court has applied the principles already discussed. For example, in *Buffalo Forge Co. v. United Steelworkers*, 428 U.S. 397, 96 S.Ct. 3141, 49 L.Ed.2d 1022 (1976), the Court was confronted with the question of whether a sympathy strike may be enjoined pending arbitration of the question of whether the strike violated the express no-strike clause in the contract. The Court first held that the applicability of the no-strike clause to the sympathy strike was arbitrable.[2]

Turning to the availability of injunctive relief, the Court carefully distinguished the arbitrability of the subject matter of the strike from the arbitrability of the applica-

bility of the no-strike clause to the sympathy strike:

> The District Court found, and it is not now disputed, that the strike was not *over* any dispute between the Union and the employer that was even remotely subject to the arbitration provisions of the contract. The strike at issue was a sympathy strike in support of sister unions negotiating with the employer; neither its causes nor the issue underlying it was subject to the settlement procedures provided by the contracts. . . .

*Id.* at 407–08, 96 S.Ct. at 3147–3148. Furthermore, the Court expressly relied on the quid pro quo theory to support its analysis. *See id.* at 407, 96 S.Ct. at 3147. The Court concluded that because the subject matter of the strike was not arbitrable between the sympathy strikers and their employer, the strike could not be enjoined pending arbitration of the scope of the express no-strike clause.

The relevance of *Buffalo Forge* is the recognition that, absent some evidence to the contrary, the quid pro quo theory underlying coterminous interpretation applies where there is an express no-strike clause in the contract. Normally, the employer will not agree to arbitration unless he gets an agreement from the union that it will not strike over those arbitrable issues. In addition, in the normal case the union will not agree to a no-strike clause that extends beyond the arbitration clause.

Moreover, the contract here supports coterminous interpretation. The arbitration clause is expressly tied to disputes between the production and maintenance employees and the Employer. As noted previously, the contract defines arbitrable grievances as disputes between the parties "arising . . . under or out of" the contract. Nowhere does the contract mention the rights of the drivers or any other employees but the production and maintenance employees. *See* note 5 *infra* and accompany-

---

2. Given the wording of Section 3 of Article 16 that "[t]he provisions of this Article . . . shall not be subject to grievance or arbitration," it would seem that the scope of the no-strike clause is not subject to arbitration. Thus this first issue in *Buffalo Forge* is not before us.

ing text. Thus the definition of arbitrable grievances means that the production and maintenance employees could not have invoked arbitration over the dispute between the drivers and the Employer.

Although we realize that coterminous interpretation must be applied to the facts in each case, see *Gateway Coal Co., supra*, 414 U.S. at 382, 94 S.Ct. at 639, we believe that the reasoning behind it leads to the conclusion that a no-strike clause, without more, does not waive the right to sympathy strike. Coterminous interpretation rests on a perception of labor relations that has equal force where there is an express no-strike clause. Without evidence to the contrary, it is proper to presume that the no-strike clause is not broader than the arbitration clause. Thus we feel that where the sympathy strikers and their employer cannot arbitrate the subject matter of the primary dispute, a generally worded no-strike clause does not bar the sympathy strike.

A second source of support for the conclusion that broad, general language will not waive the right to sympathy strike is *Mastro Plastics Corp. v. NLRB*, 350 U.S. 270, 76 S.Ct. 349, 100 L.Ed. 309 (1956). There, the Supreme Court held that a broad, general no-strike clause did not waive the right to engage in unfair labor practice strikes. The Court noted that broad phrases like "any strike" should be read in light of the rest of the contract. The Court then noted that the contract, taken as a whole, dealt with the economic relations between the unfair labor practice strikers and their employer, such as wages, hours, and so forth. In effect, the no-strike clause was a promise by the union not to strike over matters covered by the contract. *See id.* at 281–83, 76 S.Ct. at 357–358.[3]

*Mastro Plastics* is a helpful analogy. Here, as there, the dispute between the production and maintenance employees and the Employer is not over anything covered by the 1976 contract. As already noted, the contract, taken as a whole, does not cover the drivers and their relation with the Employer. *See generally* note 5 *infra* and accompanying text. As in *Mastro Plastics*, it is proper to read the no-strike clause as limited to strikes over matters covered by the contract. Thus under *Mastro Plastics* the no-strike clause does not waive the right to sympathy strike because the dispute is not over the economic relations between the sympathy strikers and their employer as they are explicated in the 1976 contract. *See generally NLRB v. C. K. Smith & Co.*, 569 F.2d 162, 167 (1st Cir. 1977), *cert. denied*, 436 U.S. 957, 98 S.Ct. 3070, 57 L.Ed.2d 1122 (1978). *See also Suburban Transit Corp. v. NLRB*, 536 F.2d 1018, 1021–22 (3d Cir. 1976) (strike violated no-strike clause because even though the strike was over a dispute with the union, it also involved a dispute with the employer).

Accordingly, we hold that a broad no-strike clause that is generally worded does not constitute a clear and unmistakable waiver of the right to sympathy strike. Absent some contrary evidence, the notion that the no-strike clause is the quid pro quo for the arbitration clause applies with equal force where there is an express no-strike clause. Relevant Supreme Court precedent, as shown by both *Buffalo Forge* and *Mastro Plastics*, supports the conclusion that a broadly worded no-strike clause does not waive the right to strike over nonarbitrable matters that are not covered by the strikers' contract. Moreover, this accords with the general rule that waiver must be clear

---

**3.** The Union claims that *Mastro Plastics* controls the result here because the Employer's refusal to bargain and its claim that the drivers "fell back within" the 1976 collective bargaining agreement makes the strike an unfair labor practice strike. We disagree. Even assuming that the *drivers'* strike was an unfair labor practice strike, that in no sense diminishes the fact that the production and maintenance employees were engaged in a sympathy strike. *Mastro Plastics* focuses on the nature of the

strike as it relates to the strikers and their employer. Moreover, the characterization of a strike as an unfair labor practice strike or a sympathy strike may have analytical and legal consequences outside the present context, such as remedies in unfair labor practice proceedings. Accordingly, we decline to say that the sympathy strike automatically should be treated as an unfair labor practice strike if the primary strike is over an alleged unfair labor practice.

and unmistakable and that explicit language will not be read expansively.

### C.

If we were writing on a clean slate, we might opt for a rule that would end the inquiry by asking whether the language of the contract explicitly deals with the right of employees to sympathy strike. Such an approach would have the benefit of reducing the litigation engendered by uncertainty over whether any of the wide variety of factors usually considered will constitute waiver.

However, we do not feel free to adopt such an approach and therefore now turn to the factors examined by the district court to determine whether they constitute sufficient evidence of waiver. Initially, we note that because the parties offered no evidence as to the negotiation of the 1976 contract, we need not decide whether evidence of bargaining history could overcome the result here. See NLRB v. Rockaway News Supply Co., 345 U.S. 71, 73 S.Ct. 519, 97 L.Ed. 832 (1953) (evidence that employer rejected a clause offered by union to effect that employees could refuse to cross picket line).

The first factor relied on by the district court to find waiver was a finding that the arbitration and no-strike clauses here were "functionally independent." Its reasoning essentially was that where the no-strike clause and the arbitration clause are related, then the no-strike clause only covers arbitrable issues, but where they are independent, the no-strike clause is broader.

■ The district court never explained the precise meaning of the phrase "functionally independent." It did refer to "a no-strike clause which was included in the grievance procedures of a contract or which was directly tied to arbitrable matters." If by this the court meant that the language or structure of the contract somehow had to tie the no-strike clause and the arbitration clause together,[4] our previous discussion disposes of that. Because the no-strike clause normally is the quid pro quo for the arbitration clause, the normal assumption is that they are functionally related, even if the contract does not explicitly condition one on the other. Physical separation or lack of cross-reference in the contract cannot constitute clear waiver of the right to sympathy strike.

On the other hand, the district court might have been referring to Section 3 of Article 16, which states that the "provisions of [the no-strike clause] . . . shall not be subject to grievance or arbitration, for the purpose of assessing damage or securing specific performance, or any other matter." This language would seem to mean only that the question of whether a particular strike violated the no-strike clause is not arbitrable. See note 2 supra. As already noted in our discussion of Buffalo Forge, that is analytically distinct from whether the subject matter of the strike is arbitrable. Because our decision rests on the latter question, Section 3 has no impact on our reasoning.

Next, the district court relied on the law existing at the time the contract was made to infer waiver of the right to sympathy strike. It noted that in 1976, several courts had held that where the no-strike clause and the arbitration clause were tied together, the no-strike clause did not waive the right to sympathy strike. See note 4 supra. From these cases, the court reasoned that "at the time the contract was executed there was an established distinction in the case law between broad, independent no-

---

4. For example, the district court relied on NLRB v. Keller-Crescent Co., 538 F.2d 1291 (7th Cir. 1976). The contract provided that there would be no strike unless either party refused to comply with the grievance procedures. Id. at 1293 n.2. Buffalo Forge, however, demonstrates that the no-strike obligation need not be expressly conditioned on the arbitration clause for the quid pro quo rationale to apply. In Buffalo Forge, as here, the no-strike clause and the arbitration clause were in successive sections of the contract and neither referred to the other. See 428 U.S. at 399 n.1, 400 n.2, 96 S.Ct. at 3144 n.1, 3144 n.2. Nevertheless, the Supreme Court employed coterminous interpretation in its analysis. Id. at 407, 96 S.Ct. at 3147.

strike clauses and more limited, dependent no-strike clauses." The court concluded that because here the no-strike clause was independent, the parties intended the no-strike clause to be broader than the arbitration clause.

Even assuming that the cases cited by the district court rested on the fact that the no-strike clause and the arbitration clause were "functionally tied together," it does not follow that there was a distinction between independent and dependent clauses. The mere fact that dependent clauses preclude waiver does not necessarily mean that independent clauses will result in waiver. Indeed, the quid pro quo theory, which was established at the time the present contract was signed, militates against such a distinction. Moreover, the district court cited no case, and research reveals none, where a court had held that independent clauses would lead to waiver of the right to sympathy strike. Because we can find no clear distinction in the 1976 case law between independent and dependent clauses, the law at the time of the signing of the contract is not clear and unmistakable evidence that the union intended to waive the right to sympathy strike.

The district court also relied on the conduct of the parties prior to and during the strike here to determine their understanding of the contract as it related to whether the sympathy strike was prohibited. We of course recognize the danger inherent in utilizing such evidence because it may not reflect the parties' intention of the time of the execution of the contract. Nevertheless, the district court considered such evidence in reaching its result, and we feel constrained to address it. The district court relied on the following events:

(1) The district court found that when Jones, the manager of the plant, told the president of the Union that a strike would violate the 1976 contract, the president replied "I don't care." In fact, Jones testified as follows:

Q: Will you relate to the Court what you told [the president] at that time?

A: Well, our determination was that . . . after we had cancelled Countrywide Personnel's agreement with us, that the drivers would fall back into the plant contract, the production and maintenance workers' contract, and the union's position was that there should be two different contracts. And because we were not able to reach a decision that day, [the president] stated that they were going on strike. And I stated during the meeting that if they did, they would be in violation of the production and maintenance workers' contract.

Q: What was his reply to that?

A: [He] said it didn't matter. The time to strike the Coca-Cola plant was in the summertime, and he wasn't going to wait until the issue was resolved.

This testimony is not clear and unmistakable evidence that the president believed the contract waived the right of the production and maintenance employees to strike. Initially, when the president said "they were going on strike," it is unclear whether he meant the drivers, the production and maintenance employees, or both. Thus the entire exchange is ambiguous because we cannot tell what kind of strike Jones and the president were talking about.

Moreover, given that Jones had just said that the drivers were covered by the 1976 contract, then Jones's reply to the threatened strike—that "it" would violate the contract—could mean that he was saying that the drivers' strike would violate the 1976 contract. Thus the president's remark is ambiguous because by saying "it didn't matter," the president could have meant that Jones's comment about the strike violating the 1976 contract was irrelevant because the president believed the drivers' strike would not violate any contract.

(2) During the strike, the Eastern Conference of Teamsters sent a telegram to the local stating that the sympathy strike violated the 1976 contract. We find this to fall short of the standard of proof. The

Eastern Conference was not involved in negotiating the 1976 contract, making its views less than persuasive on the intent of the Union to waive the right to sympathy strike. Moreover, when the production and maintenance employees sympathy struck in March 1976, the Conference remained silent.

(3) The district court found that the union shop steward told the employees that a sympathy strike would violate the 1976 contract. The record is at variance with this finding. The testimony reads:

> A: I went and I told the production personnel that there was liable to be a strike in the morning, but I also told them that under Article 16 in the contract, that if they—and that each man was to use his own judgment about going to work.

A statement that each employee should use his own judgment is not evidence that the steward thought a sympathy strike would violate Article 16.

(4) Some of the members of the Employer's management told the Union that a sympathy strike would violate Article 16. We decline to hold that an employer's statements, without more, are evidence of the union's intent to waive the right to sympathy strike.

■■ In short, none of this evidence, singly or collectively, supports an inference that the Union believed a sympathy strike by the production and maintenance employees would violate the 1976 contract.

■■ Finally, it does not matter that all employees were represented by the same local or that only one employer was involved. In *United States Steel Corp. v. UMW (U.S. Steel III)*, 593 F.2d 201 (3d Cir. 1979), one local of the UMW struck U.S. Steel, and other UMW locals representing U.S. Steel employees went out on sympathy strikes. We held that, unlike in *U.S. Steel II*, the implied no-strike obligation barred

the sympathy strike in question. *U.S. Steel III* employed a two-prong test to reach this result, and neither of the two prongs is satisfied here.

The first prong of the *U.S. Steel III* test was that the dispute between the primary employees and their employer must be subject to arbitration. 593 F.2d at 208. Here, the drivers never signed a contract with the Employer. The district court found that negotiations with the drivers continued after the contract with the production and maintenance employees was signed right up until the drivers became employees of Countrywide. Indeed, Article 1 of the 1976 contract is a recognition clause, and it is limited to the production and maintenance employees.[5] Nowhere does it mention that the drivers are covered. Thus because the drivers were not parties to the 1976 contract, their dispute with the Employer was not arbitrable.

The second prong of the *U.S. Steel III* test dealt with the fact that although "technically" the sympathy striker's local could not arbitrate the dispute between the employer and the primary strikers, the dispute essentially was between the UMW and U.S. Steel. We noted that both the primary strikers and the sympathy strikers were subject to the same collective bargaining agreement that had been negotiated by their international, not the locals. *See id.* at 208–09. Here, by contrast, the drivers and the production and maintenance employees were not subject to the same contract. Indeed, the drivers seem to have had no contract at all.

To summarize, we hold that a broad, general no-strike clause does not constitute evidence of clear and unmistakable waiver of the right to sympathy strike. Absent evidence to the contrary, where the subject matter of the strike is not arbitrable between the sympathy strikers and their employer and where the contract read as a

---

5. Article 1 states: "The Company recognizes and acknowledges that the Local Union is the sole and exclusive representative of all employees in the classification of work covered by this Agreement for the purpose of collective bargaining for all production, loading and shipping, cooler, advertising and janitorial employees . . . but excluding all office clerical employees, guards, supervisors, advance salesmen, and tell-sell employees."

whole indicates that the no-strike clause is limited to issues covered by the contract, such general language will not be read to cover sympathy strikes. Here, none of the evidence satisfies the quantum of proof necessary to overcome this result. The parties presented no evidence of bargaining history, and neither the law at the time of the signing of the contract nor the parties' conduct during the events here supply evidence from which an inference was warranted that the Union intended to waive the right to sympathy strike.

### III.

The judgment of the district court will be reversed.

ROSENN, Circuit Judge, concurring.

I agree with the majority that the judgment of the district court holding Local 326 liable to Coca-Cola for damages as a result of the sympathy strike must be reversed. I write separately, however, to express my disagreement with the analytical framework employed by the majority to resolve this case. My objection is to the majority's extension of the doctrine of coterminous application to collective bargaining agreements with express no-strike clauses independent of the arbitration clause. I also except to the rule laid down by the majority that the employer necessarily must show clear and unmistakable waiver of the right to engage in a sympathy strike where a broad, unambiguous no-strike clause bars *any strike* or *any picketing*. Rather, I believe the controlling factor which renders the no-strike clause impotent here is the apparent commission of unfair labor practices by the employer against the truck drivers which precipitated a primary strike by them and a sympathy strike by the inside workers.

### I.

The majority has adequately recounted the events leading up to the strike by the truck drivers and the resultant sympathy strike by the inside production and maintenance employees (inside workers). *See* maj. op. at 1183–1184. Several salient features of this case need to be underscored because I believe they become critical to its proper resolution. First, the strikes here were by separate bargaining units of the *same* union local dealing with a common employer at a common work site. Second, the no-strike clause in the contract between Coca-Cola and the inside workers was in no way tied to the arbitration clause in the contract. *See* maj. op. at 1186 n.2. Third, the primary strike by the truck drivers against Coca-Cola occurred only after the Company refused to collectively bargain with them following their re-transfer from Countrywide Personnel. Last, the issue before us is not whether injunctive relief will lie but only whether an award of damages may be obtained for the union's alleged breach of the no-strike clause.

With these facts in mind, I first proceed to the majority's analysis. The majority first holds that the express no-strike clause in the inside workers' contract with Coca-Cola was not broad enough to waive the right to a sympathy strike, because the primary strike by the truck drivers was not over any dispute within the terms of the inside workers' arbitration clause. The majority reaches this result by importing the doctrine of "coterminous application" from cases in which the collective bargaining agreement is devoid of a no-strike clause but one is *implied* from the presence of an arbitration clause.

In *Teamsters Local v. Lucas Flour*, 369 U.S. 95, 82 S.Ct. 571, 7 L.Ed.2d 593 (1962), the Court announced that in the absence of a no-strike clause, the presence of an arbitration clause in a collective bargaining agreement will give rise to an implied obligation not to strike over arbitrable disputes. This view was confirmed and refined in *Gateway Coal Co. v. United Mine Workers*, 414 U.S. 368, 94 S.Ct. 629, 38 L.Ed.2d 583 (1974). There, the Court held in an implied no-strike clause case, that "the agreement to arbitrate and the [implied] duty not to strike should be construed as having coterminous application." *Id.* at 382, 94 S.Ct. at 639. Coterminous application means noth-

ing more than that a court will not imply a no-strike clause broader than the arbitration clause from which it emanates. Therefore, if the strike is over a nonarbitrable dispute, the strike may not be restrained. The theoretical basis for coterminous application is that a no-strike clause is considered the *quid pro quo* of an arbitration clause in a labor contract. *See Textile Workers Union v. Lincoln Mills*, 353 U.S. 448, 77 S.Ct. 923, 1 L.Ed.2d 972 (1957). When a no-strike clause is absent in a contract, but an arbitration clause is present, its presence indicates the parties' intent to settle disputes peacefully. Therefore, it is only fair to imply a duty not to strike. In the absence of language to the contrary, it makes sense to limit the obligation not to strike to the scope of the arbitration clause from which it draws its force. Thus, the union may not strike over any matter subject to arbitration.

In *United States Steel Corp. v. UMW (U.S. Steel II)*, 548 F.2d 67 (3d Cir. 1976), *cert. denied*, 431 U.S. 968, 97 S.Ct. 2926, 53 L.Ed.2d 1063 (1977), we were faced with the question of whether a duty not to engage in a sympathy strike could be implied from an arbitration clause in the absence of an express no-strike clause. We held that because the subject of the strike was not over any arbitrable dispute, a duty not to engage in a sympathy strike could not be implied. 548 F.2d at 73. However, as the majority correctly notes, maj. op. at 1185, we did not decide in *U.S. Steel II* whether an *express* no-strike clause might waive the right of the union to engage in a sympathy strike.

In the present case, we are not faced with the problem of whether an obligation not to strike may be implied from an arbitration clause, and thus, with the doctrine of coterminous application. We have a broad express no-strike clause which prohibits any strike or work stoppage. Article 16 of the collective bargaining agreement provides:

> Section 1. The Union will not cause nor will any member of the bargaining unit

take part in any strike, sit-down, stay-in, slow down in any operation of the Company or any curtailment of work or restriction of service or interference with the operation of the Company or any picketing or patrolling during the term of this Agreement.

The no-strike clause is not limited to strikes over arbitrable grievances—it prohibits *any* strike. Indeed, the parties have further isolated the no-strike clause from the arbitration clause of the contract by expressly providing that the question of whether a strike violates the no-strike clause is *not* an arbitrable dispute under the contract.[1] Thus, I view the no-strike clause in this case, as did the district court, to be functionally independent from the arbitration clause of the contract. It is at this point that the majority advances its thesis that even an express no-strike clause must be coterminously applied with the arbitration clause. It holds that because the strike by the truck drivers was not an arbitrable grievance under the inside workers' contract with Coca-Cola, the inside workers had the right to engage in a sympathy strike despite the broad express no-strike clause. The majority relies heavily on the Supreme Court's decision in *Buffalo Forge Co. v. United Steel Workers*, 428 U.S. 397, 96 S.Ct. 3141, 49 L.Ed.2d 1022 (1976), to support its thesis. I believe this reliance is misplaced.

In *Buffalo Forge Co. v. United Steel Workers*, 428 U.S. 397, 96 S.Ct. 3141, 49 L.Ed.2d 1022 (1976), the precise issue for decision was whether a federal court may enjoin a sympathy strike pending the arbitrator's decision as to whether the strike is forbidden by the express no-strike clause contained in the collective bargaining agreement between the employer and the striking union. In that case, the employer's office clerical and technical employees struck and picketed the company's plants during negotiations for a collective bargain-

---

1. Section 3 of the no-strike clause provides that the provisions of this Article, other than mentioned above, "shall not be subject to grievance or arbitration, for the purpose of assessing damages or securing specific performance, or any other matter, such matters of law being determinable and enforceable in the courts."

ing agreement. The employer's production and maintenance employees represented by the defendant unions honored the picket lines in support of their sister unions despite their contractual promise with the employer not to strike. The no-strike clause was tied to the arbitration clause; whether the sympathy strike violated the no-strike clause was itself an arbitrable dispute under the contract. As in this case, the strike at issue was a sympathy strike in support of sister unions negotiating with the employer.

The Court held in *Buffalo Forge* that the sympathy strike could not be enjoined because the subject matter of the primary strike was not arbitrable under the sympathy strikers' contract with the employer, and therefore, was not within the narrow exception to the Norris-LaGuardia Act announced in *Boys Markets, Inc. v. Retail Clerks Union*, 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970). The Norris-LaGuardia Anti-Injunction Act of 1932, 29 U.S.C. § 101 (1976), deprived federal courts of jurisdiction to issue any restraining order or injunction against peaceful strikes involving or growing out of a labor dispute. In *Boys Market*, however, the Court excepted from the general prohibition against injunctions in labor disputes those cases in which an injunction was sought to require the arbitration of a matter subject to the settlement procedures in the collective bargaining agreement.[2] This result was necessary to give meaning to "the congressional policy favoring the voluntary establishment of a mechanism for the peaceful resolution of labor disputes." 398 U.S. at 253, 90 S.Ct. at 1594.

I believe, therefore, that the relationship between the sympathy strikers' right to strike and the arbitration clause of the contract in *Buffalo Forge* must be read in the context of the relief requested, namely an injunction. The nonarbitrability of the underlying dispute only relates to the availability of injunctive relief under *Boys Market*, not to a suit for damages. I see nothing in *Buffalo Forge* to indicate that in a suit for *damages*, the relationship between the arbitration and no-strike clause is in any way germane to whether the strike is in violation of the no-strike clause. Indeed, a remedy in damages for the violation of an express no-strike clause becomes all the more necessary in light of the general unavailability of injunctive relief under the Norris-LaGuardia Act. Precisely for this reason, Congress undertook to restore some equilibrium in industrial relations with the enactment of the Labor Management Relations Act of 1947, wherein it permitted relief for breach of the collective bargaining agreement in the form of damage actions under section 301, 29 U.S.C. § 185 (1976), in federal or state courts.

In *Atkinson v. Sinclair Refining Co.*, 370 U.S. 238, 82 S.Ct. 1318, 8 L.Ed.2d 462 (1962), (Atkinson II), the Court had before it the issue of damages growing out of the same strike in which it had denied injunctive relief in *Atkinson, supra*, note 2, 370 U.S. 195, 82 S.Ct. 1328, 8 L.Ed.2d 440. Both cases were decided the same day and decided separately the questions pertaining to

---

2. The Court thereby retreated from its earlier position that such an injunction was barred under Norris-LaGuardia. In *Sinclair Refining Co. v. Atkinson*, 370 U.S. 195, 82 S.Ct. 1328, 8 L.Ed.2d 440 (1962), the employer brought an action under section 301(a) of the Labor Management Relations Act of 1947 to enjoin, *inter alia*, strikes and peaceable picketing, claiming the union violated its contractual promise not to strike. The contract also provided for grievance procedures terminating in final and binding arbitration. Confronted with the question whether labor policy favoring peaceful resolution of contract disputes through arbitration and judicial enforcement of no-strike policies could be accommodated with the ban upon injunctions of peaceful strikes, the Court held

that the injunction was barred by section 4 of the Norris-LaGuardia Act; that the case involved a "labor dispute" within the meaning of the Act, even if the work stoppage and strike constituted breaches of the collective bargaining agreement. Writing for the Court, Mr. Justice Black observed that although the work stoppages and strike may have constituted a breach of the collective bargaining agreement this did not alter the plain fact that the strike was a labor dispute and the injunction sought, therefore, "runs squarely counter to the proscription of strikes contained in section 4(a) of the Norris-LaGuardia Act, to the proscriptions of injunctions against peaceful picketing contained in section 4(e)." *Id.* at 203, 82 S.Ct. at 1333.

injunctive relief and damages. The no-strike clause in the contract provided: "[T]here shall be no strike . . . (1) for any cause which is or may be the subject of a grievance . . . or (2) for any other cause, except upon written notice by the union to the employer. . . ." The Court perceived the contract as "not susceptible to a construction that the Company was bound to arbitrate its claim for damages against the union by breach of the undertaking not to strike." *Id.* at 241, 82 S.Ct. at 1321. The Court therefore concluded that the employer was entitled to prove in court its claim for damages from the union for breach of contract, although it denied injunctive relief under the no-strike clause in its companion decision. *See* n.2, *supra.*

The Court in *Buffalo Forge* did not reach the issue of damages only because the issue of whether the sympathy strikers violated the no-strike clause was itself an arbitrable dispute and "[i]t was for the arbitrator to determine whether there was a breach [of the no-strike clause], as well as the remedy for any breach, . . ." 428 U.S. at 410, 96 S.Ct. at 3149. Thus, even though the sympathy strike was not enjoinable, the employer might still have been able to collect damages if the arbitrator determined the sympathy strike violated the express no-strike clause.

I believe, therefore, that *Buffalo Forge* provides no basis for coterminous application in a damage action for the breach of an express no-strike clause. I think that coterminous application is a doctrine limited solely to implied no-strike clauses in which the scope of the obligation not to strike must be measured by the breadth of the arbitration clause. Although a no-strike clause, express or implied, is the *quid pro quo* for an arbitration clause, coterminous application is necessary only in implied no-strike situations when there is no other plausible means of determining the extent of the promise not to strike. But, where a union has plainly and expressly set forth its promise in a broad no-strike provision, the breach of that promise may give rise to a suit for damages, although it may not en-title the injured party to injunctive relief if the dispute is not arbitrable.

In *W–I Canteen Services, Inc. v. NLRB*, 606 F.2d 738, 744 (7th Cir. 1979), the court stated: "[The] principle of coterminous application of the arbitration and no-strike clauses, . . . is not without exceptions. . . . The principle is merely a rule of contract interpretation and the parties may by express language indicate their intent to interpret the no-strike and arbitration clauses differently." Assuming that the employer exchanges the right to arbitration for a promise by the union not to strike, this does not necessarily mean that the promise must be coterminous. Nothing forbids the employer from securing a promise not to strike that is broader than the promise to arbitrate grievances. In this case, the arbitration and no-strike clauses were functionally independent. Coca-Cola successfully obtained a promise from the union to not engage in *any* strike—not merely strikes over arbitrable grievances. Thus, I believe we must look to the express language of the no-strike clause itself, not merely to the scope of arbitration, to determine whether an action for damages will lie. We, in essence, face the same task as the arbitrator in *Buffalo Forge* : did this particular sympathy strike violate the no-strike clause so as to give rise to an action for damages by the employer?

### III.

Facially, there can be no question that the strike in this case violates the broad no-strike clause of the Coca-Cola contract. Putting to one side the majority's attempt to limit the scope of the no-strike clause to arbitrable grievances by the concept of coterminous application, the majority alternatively finds no "clear and unmistakable" waiver of the right to engage in a sympathy strike despite the express language of the no-strike clause forbidding *any* strike or work stoppage. Maj. op. at 1186–1187. Relying principally on *Mastro Plastics v. NLRB*, 350 U.S. 270, 76 S.Ct. 349, 100 L.Ed. 309 (1956), the majority reasons that the broad

term "any strike or work stoppage" is insufficient to waive the right to a sympathy strike, and that the no-strike clause must be read in light of the contract, the bargaining history of the parties and their subsequent conduct. Despite the clear and unambiguous language of the no-strike clause, the majority looks to extrinsic parole evidence to support its efforts to hold that the no-strike clause did not bar sympathy strikes. It concludes that no such clear and unmistakable waiver is discernible from the facts of this case, and the union therefore did not relinquish its right to strike against Coca-Cola. I believe the majority takes too broad a view of *Mastro Plastics* in announcing a rule that *any* sympathy strike must be clearly and unmistakably waived before the union may be held accountable for it.

*Mastro Plastics*, like the case now before us, involved a labor contract containing a broad express no-strike clause. *Mastro Plastics*, however, significantly involved a primary strike against the employer in protest over its commission of unfair labor practices against the union. The issue in *Mastro Plastics* was whether a broad, express no-strike clause by itself could waive the union's right to strike solely in protest over the employer's commission of an unfair labor practice. The Court indicated that the answer not only turned upon the proper interpretation of the particular contract but "[l]ike other contracts, it must be read as a whole in light of *the law relating to it when made.*" *Id.* at 279, 76 S.Ct. at 356 (emphasis supplied). The Court went on to indicate that the contract must be read in light of labor policy, which is to eliminate obstructions to interstate commerce by

encouraging the practice and procedure of collective bargaining and by protecting the exercise by workers of full freedom of association, self-organization, designation of representatives of their own choosing, for the purpose of negotiating the terms and conditions of their employment or other mutual aid or protection.

*Id.* at 279–80, 76 S.Ct. at 356, *quoting* 29 U.S.C. § 151. The employer argued that the term "any strike" was broad enough to waive any right to strike over unfair labor practices. The Court rejected this argument because to so hold

would eliminate, for the whole year, the employees' right to strike, even if petitioners, by coercion, ousted the employees' lawful bargaining representative and, by threats of discharge, caused the employees to sign membership cards in a new union. Whatever may be said of the legality of such a waiver when explicitly stated, there is no adequate basis for implying its existence without a more compelling expression of it than appears in . . . this contract.

*Id.* at 283, 76 S.Ct. at 358. The Court held that the literal term "no strike" would not be interpreted as barring an unfair labor practice strike. The reason is that a literal reading would frustrate national labor policy—the employer could effectively insulate his breach of the National Labor Relations Act from any effective concerted action by the employees through a broad no-strike clause. Inasmuch as the right to strike over unfair labor practices is protected activity under section 7 of the National Labor Relations Act (NLRA), the Court was unwilling to find a waiver of such a basic right without specific reference to it, even in the presence of broad no-strike language. In short, broad no-strike language is tacitly limited, "whatever may be said of the legality of such a waiver when explicitly stated," by national labor policy forbidding employer unfair labor practices. The Court, however, believed that broad express no-strike language was sufficient to waive the union's right to engage in an economic strike. *See* 350 U.S. at 283, 76 S.Ct. at 358.

*Mastro Plastics* dealt with a serious unfair labor practice allegedly committed by the employer against the bargaining unit with whom it had collectively contracted. Circuit cases have held that *Mastro Plastics* requires a "clear and unmistakable" waiver of the right to strike over unfair labor practices. *See, e. g., Newspaper Production Co. v. NLRB*, 503 F.2d 821, 830 (5th Cir. 1974); *Kellogg Co. v. NLRB*, 457 F.2d 519, 525 (6th Cir.), *cert. denied*, 409 U.S. 850, 93 S.Ct. 58, 34 L.Ed.2d 92 (1972). Courts have

seized upon the *Mastro Plastics* rule and have applied it to sympathy strikes. *See, e. g., W–I Canteen Services, supra; NLRB v. C. K. Smith & Co.*, 569 F.2d 162 (1st Cir. 1977), *cert. denied*, 436 U.S. 957, 98 S.Ct. 3070, 57 L.Ed.2d 1122 (1978); *Gary Hobart Water Co. v. NLRB*, 511 F.2d 284, 287 (7th Cir.), *cert. denied*, 423 U.S. 925, 96 S.Ct. 269, 46 L.Ed.2d 252 (1975). This wholesale application of *Mastro Plastics* to the problem of sympathy strikes facially barred by broad express no-strike language, has proceeded largely without any consideration of national labor policy forbidding unfair labor practices. Indeed, I read *Mastro Plastics* as implicitly making every no-strike clause subject to the exception that it may not waive serious employer unfair labor practices, unless explicitly stated. The National Labor Relations Board also has limited the *Mastro Plastics* explicit waiver rule to cases in which the employer commits a *serious* unfair labor practice. *See Arlan's Department Store of Michigan, Inc.*, 133 N.L.R.B. 802, 807 (1961). I believe, therefore, that *Mastro Plastics* is limited in scope and simply posits that national labor policy demands a less literal construction of the term "no strike" when a work stoppage is precipitated by a serious breach of the NLRA by the employer.[3]

### IV.

I therefore believe that a relevant inquiry in the application of a no-strike clause in a labor contract is whether the employer has precipitated the strike by a serious unfair labor practice in violation of national labor policy. The answer would be relatively simple were we concerned, as was *Mastro Plastics*, with unfair labor practices directed to the bargaining unit with whom the employer has its labor contract. Here, however, the primary strike is by the truck drivers with whom the employer has no contract. The inside workers who are in a contractual relationship with the employer have engaged in a sympathy strike in support of the truck drivers' primary strike. Sympathy strikes are always in support of another strike for the sympathy strikers have no independent complaint against the employer. The majority eschews any focus on the nature of the primary strike in determining whether the sympathy strike is barred by broad no-strike language in the contract. *See* maj. op. at 1187 n.3. Instead, it holds that a clear and unmistakable waiver must be present in all sympathy strike cases and proceeds to determine if such a waiver is evident in the bargaining history and subsequent conduct of the parties. I believe that the controlling question is whether the rule of *Mastro Plastics* as I read it can be extended to a sympathy strike which is in support of a primary unfair labor practice strike by a sister bargaining unit of the same local against a common employer at a common work site.

A sympathy strike causes a rift between the employer and the sympathy strikers with whom he has no dispute. In most instances, I would conclude that national labor policy favoring the stability of employer-employee relationships requires that broad no-strike language be construed in its plain, unequivocal terms. However, where an employer commits a serious unfair labor practice against a sister bargaining unit of the same local at the same plant which is the underlying cause of the strike, I believe that the national labor policy favoring concerted action by employees in mutual support or protection of their rights requires that waiver of the right to strike under such circumstances be explicitly stated.

In the present case, Teamsters Local 326 represented both the drivers engaged in the primary strike and the inside workers who, by refusing to cross the drivers' picket line, engaged in a sympathy strike. Coca-Cola was the employer of both the drivers and

---

3. Particular public policies are commonly considered germane to contract interpretation in a variety of contexts. For instance, insurance contracts, because they are considered contracts of adhesion are generally interpreted in light of the policy of protecting consumers from contractual provisions over which they have no choice because of unequal bargaining strength. *See generally Brokers Title Co. v. St. Paul Fire & Marine Ins. Co.*, 610 F.2d 1174 (3d Cir. 1979).

inside workers and all the employees worked at a common job site. Initially, the local attempted to negotiate a separate contract for the drivers and the inside workers. When negotiations for the drivers' contract broke down, Coca-Cola decided to transfer their employment to Countrywide Personnel. Local 326 thereafter successfully negotiated a collective bargaining agreement for the drivers with Countrywide Personnel.

After the local's contract with Countrywide Personnel expired, the drivers were retransferred to Coca-Cola. Instead of attempting to negotiate a contract with Local 326 for the drivers, Coca-Cola insisted that the drivers "fell back" into the insider workers' contract. The local perceived this as a sham and an attempt to circumvent collective bargaining over the drivers' contract. Although no unfair labor practice charges were filed, it appears that Coca-Cola's refusal to bargain constituted a serious unfair labor practice under section 8(a)(5) of the NLRA, 29 U.S.C. § 158(a)(5).[4] Thus, the mid-summer strike by the drivers constituted an unfair labor practice strike.

Although Coca-Cola had committed no unfair labor practice against the inside workers, the existence of a serious unfair labor practice against the drivers who were represented by the same local and who worked at the same plant, understandably disrupted the labor-management relationship at the plant. Coca-Cola was apparently violating section 8(a)(5) by its continued insistence that the drivers were covered by the inside workers' contract. Congress has expressed a major national labor policy that when the National Labor Relations Board has certified a union as the exclusive bargaining agent for employees, the employer must bargain with that union in good faith. It would ill serve that policy if an employer, who has unfairly refused to bargain with a certified bargaining agent representing his employees and is thereby precipitating a strike, could sue the bargaining agent for damages because members of a related bargaining unit employed by the common employer at a common work site but with whom the employer has a contract honor the picket line and also strike. Even though a sympathy strike by the inside workers would disrupt their relationship with Coca-Cola, I believe that national labor policy favoring concerted action did not render the sympathy strike impermissible under these limited circumstances. *Cf. C. K. Smith, supra* (sympathy strikers in support of primary unfair labor practice strike entitled to reinstatement).

## V.

To summarize, I believe the doctrine of coterminous application has no place in cases in which an express no-strike clause functionally independent from the arbitration clause is present. I further believe that in view of our national labor policy protecting the right to strike over unfair labor practices under section 7 of the NLRA, a court may not find a waiver of such a basic right, even in a broad no-strike clause, unless such a waiver, whatever may be said of its legality, is explicitly stated. I would apply this rule of *Mastro Plastics* only to sympathy strikers on behalf of a sister bargaining unit's primary unfair labor practice strike against a common employer at a common work site. In these narrow circumstances, the sympathy strike is not impermissible. Therefore, I concur with the majority on this basis and I would reverse the judgment of the district court.

---

4. The pertinent provision of § 8(a)(5) reads: It shall be an unfair labor practice for an employer—

   *    *    *    *    *    *

(5) to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 159(a) of this title.