631 F.2d 282
 105 L.R.R.M. (BNA) 2506, 89 Lab.Cas. P 12,252
 HAMPTON ROADS SHIPPING ASSOCIATION, at the instance of and
on behalf of its members Cargill, Inc. and Rogers Terminal
and Shipping Corporation and Cargill, Inc., and Rogers
Terminal and Shipping Corporation, Appellees,
v.
INTERNATIONAL LONGSHOREMEN'S ASSOCIATION, Myles E. Billups,
Sr., Individually and as International Vice President; and
ILA Local 1248, Edward L. Brown, Sr., Individually and as
its President, James J. Johnson, Individually and as its
Vice President, George W. Wyatt, Individually and as its
Secretary-Treasurer, Alex Hall, Individually and as its
Business Agent, John Doe, and all other members of ILA Local
1248; and ILA Local 1963, Vernon Saunders, Individually and
as its President, James Edwards, Individually and as its
Secretary-Treasurer, John Doe and all other members of ILA
1963, or any other parties or labor organizations acting in
concert with the named defendants, Appellants.
 No. 80-1165.
 United States Court of Appeals,
Fourth Circuit.
 Argued June 2, 1980.
Decided Sept. 18, 1980.
 
 Ernest L. Mathews, Jr., New York City (Gary G. Nicolosi, Andre Mazzola Mardon, New York City, Sidney H. Kelsey, Norfolk, Va., Thomas W. Gleason, New York City, on brief), for appellants.
 Guilford D. Ware, Norfolk, Va. (Geoffrey F. Birkhead, Crenshaw, Ware & Johnson, Braden Vandeventer, Jr., John B. King, Jr., Vandeventer, Black, Meredith & Martin, Norfolk, Va., on brief), for appellees.
 Before PHILLIPS and SPROUSE, Circuit Judges, and KIDD*, District Judge.
 SPROUSE, Circuit Judge:
 
 
 1
 This is an appeal by the International Longshoremen's Association, Locals 1248 and 1963 of that Association, and their individual members (hereafter collectively Union) from the order of the District Court granting a preliminary injunction in favor of plaintiffs Hampton Roads Shipping Association (Hampton), Cargill, Inc. (Cargill), and Rogers Terminal and Shipping Corporation (Rogers). Hampton is a multi-employer bargaining agent and, on behalf of Cargill, Rogers and others, has in existence a collective bargaining agreement with the Union. Cargill operates a grain elevator and marine terminal facilities in Chesapeake, Virginia. Rogers performs stevedore services.
 
 
 2
 The ship, M/V ALEXANDROS G. TSAVLIRAS, arrived at the Port of Hampton Roads, Virginia, on February 8, 1980 (after the Soviet invasion of Afghanistan), to load 25 metric tons of corn bound for the Soviet Union. Cargill and Rogers both requested the Union to provide labor to load the vessel and were advised by the president of each local that the Union members would not work on a vessel with a cargo bound for the Soviet Union. The members of the Union subsequently refused to load the vessel. The Union also advised Rogers and Cargill that they would not provide labor to any other vessel loading grain to the Soviet Union. It is not disputed that the International Union adopted a resolution that its members would not handle any cargo bound for the Soviet Union in response to that country's invasion of Afghanistan. The Union contends and appellees deny that the resolution was prompted by the individual desires of the Union members. The resolution of that dispute is not necessary to the outcome of our decision.
 
 
 3
 The District Court, after hearings, issued a preliminary injunction prohibiting the Union from striking or refusing to load the grain at the facilities of Cargill or any other member of Hampton. It also ordered all the parties to process any grievance over the dispute in accordance with the contractual grievance procedures. The court held: "The Union's action in ordering its members to refuse to work Soviet vessels or vessels engaged to carry grain bound for the Soviet Union calling at the Port of Hampton Roads is in violation of the no-strike provisions of its agreements with HRSA and Cargill."
 
 
 4
 The trial court, in remarks from the bench adopted into its opinion, indicated that its action was based primarily on a "management" clause in the collective bargaining agreement. That clause generally retained for the Companies the right to establish rules covering the operations of their facilities and the conduct of their employees.
 
 
 5
 The collective bargaining agreement contains detailed grievance and arbitration procedures,[1] and a no-strike provision.[2] The trial court indicated in its decision that the Union members were required by the management clause to honor the work requests of the Companies, and their refusal violated the no-strike clause entitling the Companies to a preliminary injunction under Boys Markets, Inc. v. Retail Clerks Union.[3] The Union assigns a number of errors, among others, that the trial court erred in enjoining the strike prior to arbitration because the underlying dispute between the parties was not arbitrable under that collective bargaining agreement. It argues that Buffalo Forge Co. v. United Steelworkers of America,[4] prohibits such an injunction. We agree, therefore, it is not necessary to consider the other alleged errors.
 
 
 6
 The Norris-LaGuardia Act provides, in part:
 
 
 7
 No Court of the United States shall have jurisdiction to issue any restraining order or temporary injunction in any case involving or growing out of any labor dispute to prohibit any person or persons participating or interested in such dispute (as these terms are herein defined) from doing, whether singly or in concert any of the following acts:
 
 
 8
 (a) ceasing or refusing to perform any work or to remain in any relation of employment; . . . .[5]
 
 
 9
 Boys Markets created a narrow exception to the Norris-LaGuardia anti-injunction provisions and allowed federal district courts to issue injunctions against strikes when the union and company have entered into a collective bargaining arrangement containing a no-strike clause, thereby strengthening the arbitration process, stressed in the Steelworkers trilogy.[6]
 
 
 10
 Buffalo Forge refined the Boys Markets exception to the Norris-LaGuardia Act by limiting such injunctions to strike over issues that are arbitrable. The joint effect of Boys Markets and Buffalo Forge, interpreted as complementing decisions, as they must be, was succinctly discussed by Judge Widener of this Court in Cedar Coal Co. v. United Mine Workers of America.[7] Judge Widener said:
 
 
 11
 We think the Court meant to tie together the non-arbitrability of the underlying cause with the cause of the strike at issue so that, when the underlying cause is not subject to arbitration, a refusal to cross a picket line, generated by a strike over the underlying cause, is not a violation of a no-strike clause which is enforceable by injunction against the strike although it may be by arbitration. In our opinion, the Court meant thus to restrict the holding of Boys Markets, which many cases had taken to be that if an issue were arbitrable, assuming other conditions were met, an injunction might issue to prevent a strike pending arbitration of the arbitrable issue. Following Buffalo Forge, it seems that where the underlying issue is not arbitrable, then a refusal to cross a picket line set up on account of that underlying issue, although the refusal may be arbitrable, may not be prevented by injunction pending arbitration.
 
 
 12
 The district court failed to recognize that there are two distinct types of arbitrable issues that must be construed in considering every Boys Markets injunction application. The trial court must first determine if there is a specific clause in the agreement which controls the resolution of the underlying dispute. If there is, and the dispute is subject to grievance and arbitration procedures of the contract, an injunction may issue pending arbitration. If the underlying dispute is not subject to contractual grievance and arbitration proceedings, it is not arbitrable, and under Buffalo Forge the work stoppage cannot be enjoined pending arbitration. The work stoppage may still be prohibited by a general no-strike clause, but this must be decided initially by the arbitrator. The Supreme Court in Buffalo Forge explicitly stated that a work stoppage cannot be enjoined during pendency of that arbitration.
 
 
 13
 The views of the dissent add emphasis to the majority holding. Justice Stevens in his dissent stated that an injunction order should be issued if there were enough convincing evidence "that the strike is clearly within the no-strike clause."[8] The majority replied:
 
 
 14
 But this would still involve hearings, findings, and judicial interpretations of collective bargaining contracts. It is incredible to believe that the courts would always view the facts and the contract as the arbitrator would; and it is difficult to believe that the arbitrator would not be heavily influenced or wholly preempted by judicial views.[9]
 
 
 15
 The underlying cause of the Union's grievance in this case was their disagreement with the Soviet Union over its invasion of Afghanistan. Although it is at least questionable whether private citizens should unilaterally act to effect foreign relations according to their private dictates, the dispute between the Soviet Union and the Longshoremen's Unions cannot be resolved by an arbitrator. Since Buffalo Forge teaches that it is this dispute that must be arbitrable under the terms of the collective bargaining agreement in order for a work stoppage to be enjoined pending arbitration, the trial court's issuance of an injunction based on its perception that the no-strike clause had been violated was clearly contrary to this holding and the holding of this Court in Cedar Coal.
 
 
 16
 In Buffalo Forge, the Supreme Court, in considering a complaint for an injunction to require union members to cross the picket line of another union (a classic sympathy strike), said:
 
 
 17
 Nor was the injunction authorized solely because it was alleged that the sympathy strike called by the Union violated the express no-strike provision of the contracts.
 
 
 18
 . . . Here the Union struck, and the parties were in dispute whether the sympathy strike violated the Union's no-strike undertaking. Concededly, that issue was arbitrable. It was for the arbitrator to determine whether there was a breach, as well as the remedy for any breach, and the employer was entitled to an order requiring the Union to arbitrate if it refused to do so . . . . However that may be, it does not follow that the District Court was empowered not only to order arbitration but to enjoin the strike pending the decision of the arbitrator . . . .[10]
 
 
 19
 The national policy encourages the resolution of labor disputes by arbitration provisions contained in collective bargaining agreements. The basic purpose of Boys Markets was to underpin the arbitration machinery which can more effectively resolve labor disputes than can federal courts. The permeating rationale of Buffalo Forge is to strengthen the same underpinnings.
 
 In Cedar Coal this Court said:
 
 20
 (W)e take it that a correct construction of Buffalo Forge is to limit the application of Boys Markets so that it does not apply in cases where the only dispute between the company and the union is over the meaning or application of the no-strike provision, express or implied, which dispute has been brought about by a dispute which is not arbitrable.[11]
 
 
 21
 In Buffalo Forge it was not possible for an arbitrator to resolve the difference underlying the work stoppage because the difference was between the company and another union. The Companies contend, however, that Buffalo Forge 's prohibitions against injunctions pending arbitration is limited to sympathy strikes, that is, to underlying causes involving the refusal of Union members to cross picket lines established by other unions. It is not possible to construe Buffalo Forge so narrowly. The Supreme Court in Buffalo Forge, in addition to identifying the strike involved as a sympathy strike, characterized it more broadly: "The strike had neither the purpose nor the effect of denying or evading an obligation to arbitrate or of depriving the employer of its bargain."[12] Likewise, the language in Cedar Coal : "Put another way, the central question to these cases seems to be: Is the object of the strike at hand to compel the company to concede an arbitrable issue?"[13]
 
 
 22
 It is not necessary to the resolution of the issue presented here to decide if strikes over causes less clearly arbitrable than those in Boys Markets are enjoinable. We will not speculate on where that line eventually may be drawn. The grievance the Union has against the Soviet Union is clearly not arbitrable. Therefore, the only clause of the collective bargaining agreement that may have been violated by the Union in this dispute is the no-strike clause. The questions of its arbitrability and whether it prohibited the work stoppage are both for the arbitrator. It was error under the circumstances of this case to issue an injunction prior to completion of arbitration.
 
 
 23
 REVERSED AND REMANDED.
 
 
 
 *
 Honorable William Matthew Kidd, United States District Judge for the Southern District of West Virginia, sitting by designation
 
 
 [1]
 ARTICLE XI
 GRIEVANCES
 
 
 [1]
 A grievance is any controversy between the Company and the Union as to any matter involving the interpretation, application or violation of any provision of this agreement, provided that no grievance shall be considered for any purpose unless within five (5) working days after the occurrence of the event out of which the grievance arises it is presented to the employee's foreman in accordance with the provisions of Step 1 below of this Article
 
 
 [2]
 Should any such grievance arise between the Company and the Union or the employees, there shall be no suspension of work by the aggrieved on account of such grievance, but an earnest effort shall be made to settle it as follows
 
 
 [2]
 ARTICLE XII
 STRIKES AND LOCKOUTS
 It is agreed that the Union and its members, individually and collectively will not, during the term of this Agreement, cause, permit, or take part in any strike, picketing, sit-down, stay-in, slow-down or other curtailment or restriction of production or interference with work in or about the Company's plant or premises, so long as the Company abides by the terms of this Agreement. The Company reserves the right to discipline any employee taking part in any violation of this Article of this Agreement. Correlative with this provision, the Company agrees not to engage in a lockout so long as the Union abides by the terms of this Agreement.
 
 
 [3]
 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970)
 
 
 [4]
 428 U.S. 397, 96 S.Ct. 3141, 49 L.Ed.2d 1022 (1976)
 
 
 [5]
 29 U.S.C. § 104 (1973)
 
 
 [6]
 United Steelworkers of America v. Am. Mfg. Co., 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960); United Steelworkers of America v. Warrior & Gulf Navigation Co., 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960); United Steelworkers of America v. Enterprise Corp., 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960)
 
 
 [7]
 560 F.2d 1153, 1169 (4th Cir. 1977) (footnote omitted)
 
 
 [8]
 428 U.S. at 431, 96 S.Ct. at 3159
 
 
 [9]
 Id. at 412, 96 S.Ct. at 3150
 
 
 [10]
 Id. at 409-10, 96 S.Ct. at 3148
 
 
 [11]
 560 F.2d at 1170
 
 
 [12]
 428 U.S. at 408, 96 S.Ct. at 3148
 
 
 [13]
 560 F.2d at 1170. See also the reference in Cedar Coal to Armco Steel Corp. v. United Mine Workers of America, 505 F.2d 1129 (4th Cir. 1974), cert. denied, 423 U.S. 877, 96 S.Ct. 150, 46 L.Ed.2d 110 (1975). Armco was decided prior to Buffalo Forge. Armco is an example of a "non-sympathy strike" difference where an arbitrator could not resolve the grievances of the striking workers. They demanded greater gasoline allocations for their automobiles, an issue not covered by the collective bargaining agreement nor within the power of Armco to accommodate. Id. at 1169