705 F.2d 851
 113 L.R.R.M. (BNA) 2193, 97 Lab.Cas. P 10,075
 RYDER TRUCK LINES, INC., Plaintiff-Appellee,
v.
TEAMSTERS FREIGHT LOCAL UNION NO. 480; Luther Watson;
Frank Hopkins; Turner Brim; Clyde Powers; and Its Agents,
Servants, Members and Employees and All Persons Acting in
Concert With It and Employees of Ryder Truck Lines, Inc.,
Who Act In Concert With Said Named Defendants, Defendants-Appellants.
 No. 81-5127.
 United States Court of Appeals,
Sixth Circuit.
 Argued March 19, 1982.
Decided April 22, 1983.
 
 Cecil Branstetter (argued), R. Jan Jennings, Nashville, Tenn., for defendants-appellants.
 Robert H. Cowan, Michael Miller, Malcolm McCune (argued), Gracy, Maddin, Cowan & Bird, Nashville, Tenn., for plaintiff-appellee.
 Before KEITH and JONES, Circuit Judges, and PECK, Senior Circuit Judge.
 KEITH, Circuit Judge.
 
 
 1
 Appellant, Teamsters Freight Local Union No. 480, initiated a work stoppage allegedly in violation of a collective bargaining agreement with Ryder Truck Lines. Ryder filed the present action for damages pursuant to Section 301 of the Labor Management Relations Act, 29 U.S.C. Sec. 185. The district court held that the work stoppage violated the no-strike provision of the collective bargaining agreement. We vacate and remand this action for the reasons set forth below.
 
 THE DISPUTE
 
 2
 Willie Thomas and Jerry Boyd are over-the-road truck drivers and members of Teamsters Freight Local Union 480 (Union). On May 16, 1977, they were in St. Louis, Missouri awaiting assignment by Ryder Truck Lines (Ryder). A Ryder dispatcher summoned them to the terminal, assigned them a route, and identified the trucks they were to drive. After Boyd and Thomas conducted a walk-around inspection of their vehicles, they informed the dispatcher that their windshields were dirty and requested that the windshields be cleaned.
 
 
 3
 A dispute developed over responsibility for cleaning the windshields. Usually a Ryder employee called the fuel man who services the trucks, but he was not on duty. Supervisory personnel formerly performed maintenance tasks in the absence of the fuel man. However, sometime prior to the first of May the new terminal manager directed supervisors to cease washing windshields. No formal policy regarding this task had been established on the date of the incident. The dispatcher therefore consulted his supervisor and advised Thomas and Boyd that they would have to wash their own windshields.
 
 
 4
 Boyd and Thomas in turn contacted their Nashville business agent, Frank Hopkins, who consulted the Union president. After the telephone conversation, the drivers refused to wash the windshields or to proceed until they were cleaned. At this point, the dispatcher advised them that they would be considered to have "voluntarily quit" their jobs unless they complied with his directions. The drivers remained steadfast; the dispatcher consequently ordered Thomas and Boyd to vacate the premises, alleging that they had "voluntarily quit." However, Thomas and Boyd refused to leave until they were fired. The distinction, they felt, was significant. A discharged employee is furnished transportation home (in this case, Nashville) at company expense. On the other hand, an individual who voluntarily resigns is responsible for his own transportation.
 
 
 5
 When it became clear that neither side would alter its position, an official of Ryder contacted the police and swore out criminal warrants for the arrests of Thomas and Boyd on trespassing charges. The drivers, after again telephoning their Nashville agent, were arrested and escorted to jail. They remained incarcerated for approximately six hours.
 
 
 6
 During that period, the Union president met with representatives of Ryder's Nashville facility in an attempt to resolve the conflict. At approximately 6 p.m. that evening, the Union set up a picket line at the Nashville Ryder terminal and initiated a work stoppage. Meanwhile, the Union secured the release of the drivers and arranged for their return to Nashville.
 
 
 7
 Thomas and Boyd arrived in Nashville on May 17. They went immediately to the union hall and then to the Ryder terminal. According to Thomas, the strike was in progress when they arrived at the terminal at approximately 1 p.m. Though the men had not returned to work when Boyd and Thomas left the premises, they said the line was "coming down."
 
 
 8
 At 1:30 p.m. Ryder received a temporary restraining order from the United States District Court for the Middle District of Tennessee enjoining the strike.[1] Although the Union returned to work at approximately 2 p.m., the Union maintains that the strike terminated independently of the TRO when the members saw that Thomas and Boyd had been released from jail. Conversely, Ryder argues that the strike continued until the temporary restraining order was issued. The district court made no finding on what prompted the end of the strike. However, the court noted that the strike ended "after" the temporary restraining order was issued.[2]
 
 THE AGREEMENT
 
 9
 Pursuant to the Collective Bargaining Agreement,[3] the Union filed a grievance alleging that Ryder had wrongfully discharged Thomas and Boyd. Contemporaneously, Ryder filed a grievance based on the Union's alleged breach of the no-strike provision of the agreement. The relevant portion of the agreement is contained in Article 8 as follows:
 
 
 10
 Section 2. Work Stoppages.
 
 
 11
 (a) The parties agree that all grievances and questions of interpretation arising from the provisions of this Agreement shall be submitted to the grievance procedure for determination. Accordingly, except as specifically provided in other Articles of the National Master Freight Agreement, no work stoppage, slowdown, walkout or lockout shall be deemed to be permitted or authorized by this Agreement, except:
 
 
 12
 (1) failure to comply with a duly adopted majority decision of a grievance committee established by the National Master Freight Agreement or Supplemental Agreement;
 
 
 13
 (2) a National Grievance Committee deadlock of a grievance rendered pursuant to the procedures provided herein; and
 
 
 14
 (3) failure to make health and welfare and pension payments in the manner required by the applicable Supplemental Agreement...The Local Union shall give the Employer a twenty-four (24) hour prior written notice of the Local Union's authorization of strike action which notice shall specify the majority grievance committee decision or deadlocked National Grievance Committee decision providing the basis for such authorization.
 
 
 15
 Article 44 of the Supplemental Agreement further provides:
 
 
 16
 The Unions and the employers agree that there shall be no strikes, lockouts, tieups, or legal proceedings without first using all possible means of settlement as provided for in this Agreement and in the National Agreement, if applicable, of any controversy which might arise.
 
 
 17
 The grievance committee, a permanent national forum consisting of an equal number of union and employer representatives,[4] decided the wrongful discharge issue in favor of the union. Thomas and Boyd were reinstated with back pay and the union was reimbursed for the air fare from St. Louis to Nashville. However, the grievance committee failed to reach a decision at its September 8, 1977 meeting regarding Ryder's claim that the work stoppage was illegal. The committee met again on March 8, 1978 but was unable to reach a decision on the strike issue. Hence the matter was deemed to be deadlocked pursuant to Article 8, Section 2(a) of the National Master Freight Agreement. Ryder returned to district court and filed an amended complaint seeking damages.
 
 
 18
 On January 12, 1981 a bench trial was held. The court concluded on January 27, 1981, that the strike violated "the specific terms of the collective bargaining agreement." The court found: (1) that the strike "was not authorized by any of the exceptions to the no-strike clause in the collective bargaining agreement as set forth in Article 8, Section 2(a) of the National Master Freight Agreement"; and (2) "that the 24-hour notice requirement as a condition precedent to any strike was not complied with by Defendant [union] prior to the strike." The court entered judgment in favor of Ryder, and awarded compensatory damages in the amount of $26,238.50. The Union appeals.
 
 ANALYSIS
 
 19
 The pivotal issue this Court must address is whether the union breached the no-strike clause of the Collective Bargaining Agreement when it initiated the work stoppage. Ryder argued and the district court concluded that the express language of the no-strike clause precluded judicial interpretation and unambiguously prohibited all strikes. The union contends that a contractual prohibition against work stoppage does not invalidate the right to conduct a work stoppage to protest matters which cannot be resolved under contractual grievance procedures. Allegedly, a work stoppage precipitated by a non-arbitrable dispute does not come within the purview of the contract, and cannot constitute a breach of the no-strike clause. We agree.
 
 
 20
 The right to strike or engage in work stoppages, guaranteed by Section 7 of the National Labor Relations Act, 29 U.S.C. Sec. 157, may be surrendered or waived by an express provision in the collective bargaining agreement. Mastro Plastics Corp. v. NLRB, 350 U.S. 270, 280, 76 S.Ct. 349, 356, 100 L.Ed. 309 (1956). Certain statutory rights such as the right to strike "are conferred on employees collectively to foster the process of bargaining and properly may be exercised or relinquished by the union as a collective bargaining agent to obtain certain economic benefits for union members." Alexander v. Gardner-Denver Co., 415 U.S. 36, 51, 94 S.Ct. 1011, 1021, 39 L.Ed.2d 147 (1974). The promise not to strike, therefore, is the quid pro quo for the employer's promise to submit grievances to arbitration. Boys Markets v. Retail Clerks, 398 U.S. 235, 248, 90 S.Ct. 1583, 1591, 26 L.Ed.2d 199 (1970).
 
 
 21
 The concept of coterminous interpretation is founded upon the quid pro quo theory. That is, the right to strike may be bargained away in exchange for an employer's promise to bestow certain benefits such as terminal arbitration. Coterminous interpretation refers to the notion that if the subject matter of the strike is arbitrable, then the strike violates the no-strike clause. Delaware Coca-Cola v. General Teamsters Local Union, 624 F.2d 1182, 1185 (3d Cir.1980). Correlatively, the obligation to refrain from striking is not violated when the subject of the strike is non-arbitrable. Id.
 
 
 22
 The Union refers this Court to several Supreme Court cases which apply the concept of coterminous interpretation. Ryder maintains that the Supreme Court cases are inapposite because they involve injunctive relief. The cases are not applicable, according to Ryder, because there are statutory limitations on the use of injunctive relief. Ryder maintains that the Norris LaGuardia Act,[5] 29 U.S.C. Secs. 101-115, forbidding the issuance of injunctions in labor disputes, requires that a strike be over a dispute subject to arbitration before an injunction can issue.
 
 
 23
 It is also argued that those cases involving implied no-strike provisions are distinguishable from express no-strike clauses. Ryder concedes that when an implied no-strike obligation is present, inquiry must be made into whether the dispute is arbitrable since an implied no-strike provision extends only to strikes over arbitrable grievances. However, Ryder maintains that the analysis of cases involving injunctive relief or implied provisions is not controlling when there is an express clause. We disagree. We find these cases to be instructive. The principles enunciated by the Supreme Court rest on a perception of labor relations that has equal force where there is an express no-strike clause. See Delaware Coca-Cola, 624 F.2d at 1187.
 
 
 24
 In Teamsters Local 174 v. Lucas Flour, 369 U.S. 95, 82 S.Ct. 571, 7 L.Ed.2d 593 (1962) the employer fired an employee for unsatisfactory performance, and the union called a strike. The employer brought suit under section 301 of the Labor Management Relations Act, seeking damages for an alleged illegal strike. Though the agreement did not contain an express no-strike provision, the court found an implied duty not to strike inherent in the union's obligation to arbitrate. In holding that the strike violated the agreement, the Supreme Court gave deference to "the basic policy of national labor legislation to promote the arbitral process as a substitute for economic warfare." Id. at 105, 82 S.Ct. at 577.[6] Consistent with that policy, the Court established certain boundaries to the scope of such a no-strike obligation:
 
 
 25
 What has been said is not to suggest that a no-strike agreement is to be implied beyond the area which it has been agreed will be exclusively covered by compulsory terminal arbitration.
 
 
 26
 Id. at 106, 82 S.Ct. at 578 (emphasis added).
 
 
 27
 Similarly, in Gateway Coal Co. v. United Mine Workers of America, 414 U.S. 368, 94 S.Ct. 629, 38 L.Ed.2d 583 (1974), the Court recognized the relationship between the no-strike and arbitration clauses. After emphasizing that a no-strike obligation is undertaken in exchange for the employer's promise to arbitrate, the Court stated:
 
 
 28
 Thus, an arbitration agreement is usually linked with a concurrent no-strike obligation, but the two issues remain analytically distinct. Ultimately, each depends on the intent of the contracting parties. It would be unusual, but certainly permissible, for the parties to agree to a broad mandatory arbitration provision yet expressly negate any implied no-strike obligation.... Absent an explicit expression of such an intention, however, the agreement to arbitrate and the duty not to strike should be construed as having coterminous application.
 
 
 29
 Id. at 382, 94 S.Ct. at 639.
 
 
 30
 The Supreme Court's holding in Buffalo Forge v. United States Steelworkers, 428 U.S. 397, 96 S.Ct. 3141, 49 L.Ed.2d 1022 (1976) is most compelling. Buffalo Forge, which contains an express no-strike provision in the collective bargaining agreement, is the culmination of the analysis developed in Lucas Flour and Gateway Coal. In holding that the Boys Market[7] injunction against strikes would not extend to strikes arising from non-arbitrable grievances, the Court reiterated that "the quid pro quo for the employer's promise to arbitrate was the union's obligation not to strike over issues that were subject to the arbitration machinery." Id. at 407, 96 S.Ct. at 3147. Moreover, the Court noted:
 
 
 31
 the strike was not over any dispute between the Union and the employer that was even remotely subject to the arbitration provisions of the contract. The strike at issue was a sympathy strike in support of sister unions negotiating with the employer; neither its causes nor the issue underlying it was subject to the settlement procedures provided by the contracts between the employer and the respondents. The strike had neither the purpose nor the effect of denying or evading an obligation to arbitrate or of depriving the employer of its bargain. Thus, had the contract not contained a no-strike clause or had the clause expressly excluded sympathy strikes, there would have been no possible basis for implying from the existence of an arbitration clause a promise not to strike that could have been violated by the sympathy strike in this case. Gateway Coal Co. v. Mine Workers, 414 U.S. at 382 [94 S.Ct. at 639].
 
 
 32
 Id. at 407-08, 96 S.Ct. at 3147-48. See Jacksonville Bulk Terminals, Inc. v. International Longshoremen's Association, --- U.S. ----, 102 S.Ct. 2673, 73 L.Ed.2d 327 (1982) (Supreme Court refused to enjoin a sympathy strike in a case involving an express no-strike provision, because the underlying dispute was not arbitrable).
 
 
 33
 The vast weight of authority indicates that an express waiver of the right to strike cannot be read in a vacuum. A no-strike provision must be interpreted in light of the concomitant duty to arbitrate. The Third Circuit in Delaware Coca-Cola stated, "Relevant Supreme Court precedent as shown by both Buffalo Forge and Mastro Plastics, supports the conclusion that a broadly worded no strike clause does not waive the right to strike over nonarbitrable matters that are not covered by the strikers' contract." 624 F.2d at 1187.[8] The Ninth Circuit also held that a "no strike obligation is limited to disputes over arbitrable issues." NLRB v. Southern California Edison Co., 646 F.2d 1352, 1367 (9th Cir.1981). Similarly, the Seventh Circuit declared, "once a determination is made that a dispute is subject to arbitration, the obligation not to strike is considered to be coterminous." Irvin H. Whitehouse & Sons v. NLRB, 659 F.2d 830, 835 (7th Cir.1981).
 
 
 34
 Basic contract law mandates that contractual provisions be interpreted in the context of the total agreement. The meaning of a no-strike clause can be gleaned "by looking to the language of the clause, the structure of the contract, the bargaining history and other relevant conduct of the parties...." Delaware Coca-Cola, 624 F.2d at 1185.
 
 
 35
 The language of the contract between Ryder and the Union reflects a typical collective bargaining agreement dealing with terms of employment and the normal operations of the business. The no-strike provision at issue provides in pertinent part "there shall be no strikes, lockouts, tieups or legal proceedings without first using all possible means of settlement provided by the agreement" (emphasis added). This language reinforces the notion that the no-strike clause is only as wide as the settlement procedures.
 
 
 36
 More importantly, it would be inimical to fundamental principles of labor relations to prohibit strikes in protest of matters which cannot be resolved through arbitration. Therefore the reason for the strike is critical. If the dispute was subject to arbitration, the strike was illegal. On the other hand, if the subject of the strike was nonarbitrable there was no breach of the contract.
 
 
 37
 Applying these principles to this case, it is clear that the responsibility for cleaning windshields is a matter governed by the contract and subject to arbitration. Therefore, if the windshield dispute was the cause of the work stoppage, the strike was illegal. However, the arrest of employees is a matter which does not concern the contractual relationship of the parties, and cannot be resolved through grievance procedures. Hence, if the work stoppage was caused by the arrest of union men, the strike was not illegal. The district court made no finding with respect to the reason for the strike.
 
 
 38
 Evidence adduced before the district court indicated that the cause of the work stoppage was the arrest and jailing of union members. James Barton, Ryder Area Transportation Manager, testified that union representatives informed him "if we did not get them out of jail that they were going to strike on us." Barton also testified that union representatives stated "the police in St. Louis caused it [the strike]." This testimony was buttressed by the introduction of the following telegram the Union sent to Ryder: "Reason for stoppage was the company jailed two of its black employees, members of this organization, for no reason."
 
 
 39
 A factual determination of the reason for the strike was critical to a finding of liability. This Court recognizes the right of the district court to determine the facts as it deems appropriate. However, the omission of this factual determination constitutes clear error.
 
 DAMAGES
 
 40
 The district court's ultimate resolution of the issue of liability may render moot the issue of damages. However, because mootness cannot be presumed at this juncture, judicial economy compels us to address that issue in its present context. We do so cautiously with the admonition that our attention to this issue should not be construed as a preemptive expression by this court. Two questions are presented: 1) whether the profit and loss statement by which damages were calculated was properly admitted under Fed.R.Evid. 1006; and 2) whether the evidence, assuming proper admission, supports the amount of the damages award.
 
 
 41
 On appeal the Union alleges several errors with respect to the admission of the profit and loss statement. We note from the outset that only those objections raised at trial are preserved for appeal. See Fed.R.Evid. 103, Fed.R.Civ.Pro. 46; Flame Coal Co. v. United Mine Workers of America, 303 F.2d 39, 43 (6th Cir.1962). A review of the relevant portion of the transcript reveals that the Union's only specific objection to the profit and loss statement was that it was introduced into evidence through a witness who did not prepare the summary statement. Though this objection is based upon Rule 1006, we find nothing in the language of the Rule which would require that a summary be introduced through its preparer. Moreover, the summary profit and loss statement was authenticated by its preparer who later took the stand. The admission of the statement did not constitute reversible error.
 
 
 42
 The Union further contends that the profit and loss summary does not support the trial court's calculation of damages. Specifically, they object: 1) that overhead expenses for all the terminals in the Nashville region should not have been included in the calculation of damages; and 2) that Ryder's revenues should have been offset by any losses sustained as a result of the work stoppage.
 
 
 43
 On review this Court will not disturb a trial court's factual finding of the amount of damages unless the finding is clearly erroneous under Rule 52(a) Fed.R.Civ.P. The Union disputes Ryder's contention that it suffered the loss of overhead expenses for all fifteen regional terminals. We find no error in the district court's inclusion of overhead expenses for all the terminals in the Nashville region. The evidence demonstrated that the Nashville terminal served as the hub of the regional area. When work stopped there, none of the satellite terminals could operate. It was therefore not improper for the trial court to include overhead costs for all the regional satellite terminals in its damages award.
 
 
 44
 The Union's second objection is that the amount of revenues should have been offset against Ryder's claimed overhead expenses. The statement established Ryder's daily revenue at $96,359. The Union argues that overhead expenses should have been subtracted from the daily gross and any resultant loss assessed as damages. The end result would have been the diminution of Ryder's damages. However, as the district court correctly noted, there was no offset required because there were no profits. There was unrebutted testimony that the Nashville terminal sustained a loss for the last two years. The damages calculations were not clearly erroneous.
 
 
 45
 Accordingly, the failure to make a precise inquiry into the reason for the strike constituted error under the facts of this case. On remand, the District Court should make a specific finding as to whether the strike was caused by the windshield dispute or the arrest of Union men. The judgment of the district court is therefore vacated and the case remanded for further proceedings consistent with this opinion.
 
 
 46
 JOHN W. PECK, Senior Circuit Judge, dissenting.
 
 
 47
 Although I am in general agreement with the majority's resolution of the damages issues raised by the Union, I respectfully dissent because I am convinced that the explicit no-strike clauses included in the bargaining agreement waived the Union's right to strike in this case. The majority's extension of the applicability of the "doctrine of coterminous interpretation" to collective bargaining agreements containing express no-strike clauses independent of arbitration clauses from collective bargaining agreements containing arbitration clauses but no no-strike clause breaks ground better left to the legislative plow. I further regret the majority's willingness to construe the district court's findings of fact in a vacuum, the result of which is a failure to recognize that this case is one in which the Union allowed a clearly arbitrable issue to explode into a nonarbitrable one.
 
 
 48
 The majority's recounting of the facts concerning the dispute at Ryder's St. Louis terminal and the strike at Ryder's Nashville terminal is generally adequate. Several facts, however, need to be underscored because they are critical to a full understanding of this case. First, the strike continued after the drivers had been released from jail and had returned to Nashville.[1] Second, the underlying dispute over who was to clean the windshields was a controversy that could have been resolved by arbitration. Third, article 8, section 2 of the National Master Freight Agreement specifies that the local union will give the employer a twenty-four hour prior written notice of the local union's authorization of a strike action. Fourth, the Union gave no notice to Ryder prior to taking the strike action. Fifth, the strike was not authorized by any of the express exceptions to the no-strike clause contained in article 8, section 2 of the National Master Freight Agreement. Last, the issue is not whether the district court's grant of injunctive relief was proper but whether an award of damages may be granted on account of the strike.
 
 
 49
 The majority accepts the Union's argument that if the strike was in protest of the arrests, it did not violate the collective bargaining agreements because the arrests were not arbitrable under the agreements. The majority then requires this case to be remanded to the district court for a determination of the reason for the strike. In my view there is no reason to remand.
 
 
 50
 The basic question in this case is the scope of the waiver of the right to strike in the no-strike clauses of the collective bargaining agreement. The majority apparently fails to recognize that this question is totally divorced from the question whether a federal court could have enjoined the continuation of the strike without running afoul of the anti-injunction provision of Sec. 4(a) of the Norris-LaGuardia Act.[2] The majority's citation of cases involving the legality of courts' prohibition or restraint of work-stoppages is inappropriate. In such cases the issue is whether exercise of a court's equitable powers may be brought within the narrow exception to Sec. 4(a) that the Supreme Court established in Boys Markets, Inc. v. Retail Clerk's Union, 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970). Applicability of the Boys Markets exception does hinge on whether a dispute is arbitrable because "aside from the enforcement of the arbitration provisions of such contracts, within the limits permitted by Boys Markets, the Court has never indicated that the courts may enjoin actual or threatened contract violations despite the Norris-LaGuardia Act." Buffalo Forge Co. v. United Steelworkers of America, 428 U.S. 397, 409, 96 S.Ct. 3141, 3148, 49 L.Ed.2d 1022 (1976).
 
 
 51
 The majority's reliance on Buffalo Forge is misplaced. The Buffalo Forge Court, in holding that the Boys Markets exception does not sanction the enjoining of strikes over nonarbitrable disputes, did not thereby hold that actions for damages could not arise if those strikes were in violation of an express no-strike clause. See Note, Coterminous Interpretation: Limiting the Express No-Strike Clause, 67 Va.L.Rev. 729, 744 (1981) ("The limitation the Court in Buffalo Forge placed on injunctive relief for sympathy strikes resulted from the interaction between the policy favoring arbitration and the jurisdictional limitation on federal injunctions against peaceful strikes not from the coterminous interpretation of arbitration and no-strike clauses."). As Boys Markets itself recognized, "other avenues of redress, such as an action for damages, would remain open to an aggrieved employer" even if injunctive relief was prohibited by the Norris-LaGuardia Act. 398 U.S. at 248, 90 S.Ct. at 1591. Cf. Hampton Roads Shipping Ass'n v. International Longshoremen's Ass'n, 631 F.2d 282 (4th Cir.1980) (non-enjoinable work-stoppage may still be prohibited by general no-strike clause).
 
 
 52
 In support of its position that a remand is required in this case the majority offers as a settled legal rule that "[a] no-strike provision must be interpreted in light of the concomitant duty to arbitrate." Maj. op. at 857. The majority reads the legal precedents too broadly. As the Third Circuit has noted in construing the decision by a divided panel in Delaware Coca-Cola Bottling Co. v. General Teamster Local 326, 624 F.2d 1182 (3d Cir.1980), "[t]he principle of coterminous interpretation, however, is not a rule of law, but merely a tool of contract interpretation ... which 'must be applied to the facts of each case.' " Pacemaker Yacht Co. v. NLRB, 663 F.2d 455, 457-58 (3d Cir.1981) (citations omitted). The Ninth Circuit's decision in NLRB v. Southern California Edison Co., 646 F.2d 1352 (9th Cir.1981), provides little support for the majority's position because in that case the court, over Judge Markey's dissent, simply deferred to the NLRB's factual determination that the contractual no-strike provisions at issue did not prohibit a sympathy strike. Again, the majority's reliance on Irvin H. Whitehouse & Sons v. NLRB, 659 F.2d 830 (7th Cir.1981), is misplaced because that case involved an implied no-strike obligation, not an express no-strike clause. Finally, it is clear that courts have recognized that although "an arbitration agreement is usually linked with a concurrent no-strike obligation ... the two issues remain analytically distinct," Gateway Coal Co. v. United Mine Workers, 414 U.S. 368, 382, 94 S.Ct. 629, 639, 38 L.Ed.2d 583 (1974), and have held that the applicability of no-strike clauses are not limited by the scope of the arbitration clause. E.g., Iowa Beef Processors, Inc. v. Amalgamated Meat Cutters, 597 F.2d 1138 (8th Cir.), cert. denied, 444 U.S. 840, 100 S.Ct. 79, 62 L.Ed.2d 52 (1979); W-I Canteen Service Inc. v. NLRB, 606 F.2d 738 (7th Cir.1979); Amcar Division, ACF Industries, Inc. v. NLRB, 641 F.2d 561 (8th Cir.1981).
 
 
 53
 To understand the proper application of the principle of coterminous interpretation, it must be recognized that different types of labor contracts impose different no-strike obligations. In one type, the no-strike obligation is not express, but rather is implied from the mandatory arbitration provisions of the contract. Not surprisingly, such contracts are held not to forbid strikes over matters not subject to compulsory arbitration. See Gateway Coal Co. v. United Mine Workers, 414 U.S. 368, 382, 94 S.Ct. 629, 639, 38 L.Ed.2d 583 (1974) ("Absent an explicit expression of [a contrary] intention ... the agreement to arbitrate and the duty not to strike should be construed as having coterminous application.").
 
 
 54
 In other cases, such as here, the right to strike is explicitly waived in the collective bargaining agreement. Even where a dispute is not between the parties to a collective bargaining agreement, and therefore could not be settled by arbitration under the contract, the right to strike may be waived. Amcar Division, ACF Indus. v. NLRB, 641 F.2d 561, 566 (8th Cir.1981). Thus, the right to engage in a sympathy strike, or to refuse to cross a picket line, may be waived by contract. NLRB v. Rockaway News Supply Co., 345 U.S. 71, 80, 73 S.Ct. 519, 524, 97 L.Ed. 832 (1953).
 
 
 55
 The question remains whether the work-stoppage in this case was prohibited by the general no-strike clauses found in the collective bargaining agreements. The majority argues that the arrests of the drivers may have taken the Union's dispute with Ryder out of the coverage of those clauses. This argument ignores the arbitrability of the underlying dispute over the responsibility for cleaning windshields,[3] the Union's failure to provide a twenty-four hour prior written notice of the strike authorization and the absence of any authorization for the strike in the exceptions to the no-strike clause.
 
 
 56
 I would adopt the conclusions of District Judge Wiseman in this case:
 
 
 57
 [T]he parties in this case have classically made a mountain out of a mole hill. The two drivers could have washed their own windshields. One of them testified that the trucks contain automatic washers, which he customarily used. If they thought this work was not their responsibility and a dispute existed in relation to it, they could have filed a grievance over it upon their return to Nashville. The company used monumental bad judgment in causing the arrest of the two drivers. The union officials in Nashville, in frequent telephone conversation with the drivers, had the opportunity to give better advice to them than was given. The Company had the opportunity to defuse the situation when the matter was discussed between the union officials and Mr. Barton. In general, most of the actors in this drama performed with less than common sense.
 
 
 58
 The mutual errors leading up to the work stoppage cannot excuse the fact that there was an illegal strike in breach of the contract. When a union sanctions, approves, or incites an illegal strike, as the Court finds defendant has done in this case, it is liable in damages to the employer. Penn. Packing Co. v. Amalgamated Meat Cutters, Local 195, 497 F.2d 888 (3rd Cir.1974).
 
 
 59
 (Emphasis added).
 
 
 60
 Judge Wiseman's conclusions are well-supported by the language of the contract in that Article 44 of the Supplemental Agreement provides in relevant part:
 
 
 61
 The Unions and the employers agree that there shall be no strikes, lockouts, tieups, or legal proceedings without first using all possible means of settlement as provided for in this Agreement and in the National Agreement, if applicable, of any controversy which might arise.
 
 
 62
 (Emphasis added). The failure to defuse the arbitrable underlying dispute by the Union was in clear violation of its contractual obligations. Indeed, the majority's failure to find the Union's conduct to be in violation of the no-strike clause acts as an invitation to unions to allow arbitrable disputes to erupt into nonarbitrable ones. Recognition that the work-stoppage was in violation of the no-strike clauses, however, would give deference to "the basic policy of national labor legislation to promote the arbitral process as a substitute for economic warfare." Local 174, Teamsters v. Lucas Flour Co., 369 U.S. 95, 105, 82 S.Ct. 571, 577, 7 L.Ed.2d 593 (1962).
 
 
 63
 Although both Ryder and the Union may have acted obtusely in this affair, and both may have been playing games of brinksmanship in labor relations, it is the Union that violated the collective bargaining agreement by needlessly allowing a small bud of disagreement to ripen into a dispute. The Union must therefore be held liable for the strike, even though Ryder is not blameless in its handling of the problem at the St. Louis terminal. Therefore, although I am in agreement with the majority's handling of the issues raised concerning the district court's assessment of damages, I dissent from the majority's remanding this case to the district court.
 
 
 
 [1]
 The Temporary Restraining Order was issued without a hearing or any opportunity for factfinding
 
 
 [2]
 There was disputed testimony regarding whether the Union called the strike, or whether the Union simply authorized or "took over the strike after it had already begun." The court found that the Union, in fact instituted the strike through its agents Luther Watson (Union President), Frank Hopkins (Business Agent) and Turner Brim (Union Representative). Despite the Union's claim that it did not call the strike, the district court was persuaded by Luther Watson's statement that he "calls the shots" for the Union. Watson further testified that since he had been president, the members had never started or ended a strike except at his direction
 
 
 [3]
 The Collective Bargaining Agreements are known as the "National Master Freight Agreement" and the "Southern Conference Area Over-The-Road Supplemental Agreement."
 
 
 [4]
 Article 8 Section 1(b) of the National Master Freight Agreement provides in part:
 (b) Any matter which has been referred pursuant to Section 1(a) above, or any question concerning the interpretation of the provisions contained in the Master Agreement, shall be submitted to a permanent National Grievance Committee which shall be composed of an equal number of Employer and Union representatives. The National Grievance Committee shall meet quarterly, for the disposition of grievances referred to it, or may meet at more frequent intervals, upon call of the Chairman of either the Employer or Union representatives on the National Grievance Committee....
 
 
 [5]
 Section 4 of the Norris LaGuardia Act provides in part:
 No court of the United States shall have jurisdiction to issue any restraining order or temporary or permanent injunction in any case involving or growing out of any labor dispute to prohibit any person or persons participating or interested in such dispute ... from doing, whether singly or in concert, any of the following acts:
 (a) ceasing or refusing to perform any work or to remain in any relation of employment.
 29 U.S.C. Sec. 104.
 The Supreme Court has given the anti-injunction provisions of the Act a broad interpretation "recognizing exceptions only in limited situations where necessary to accommodate the Act to specific federal legislation or paramount congressional policy." Jacksonville Bulk Terminals, Inc. v. International Longshoreman's Association, --- U.S. ----, 102 S.Ct. 2673, 2678, 73 L.Ed.2d 327 (1982). See, e.g., Boys Markets, Inc. v. Retail Clerks Union, 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970).
 
 
 [6]
 The strong federal policy promoting arbitration was enunciated by the Supreme Court in the Steelworkers Trilogy. The Court established the now well-known presumption of arbitrability. United Steelworkers of America v. American Mfg. Co., 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960); United Steelworkers of America v. Warrior & Gulf Navigation Co., 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960); United Steelworkers of America v. Enterprise Wheel & Car Corp., 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960)
 
 
 [7]
 In Boys Markets, the Supreme Court re-examined Sinclair Refining Co. v. Atkinson, 370 U.S. 195, 82 S.Ct. 1328, 8 L.Ed.2d 440 (1962) which held that the Norris-LaGuardia Act precludes a federal district court from enjoining a strike in breach of a collective bargaining agreement. Under Sinclair, the prohibition existed even where the agreement contained provisions for binding arbitration of the grievance concerning which the strike was called. In order to accommodate the anti-injunction provisions of Norris-LaGuardia to the subsequently enacted provisions of Sec. 301(a) of the Labor Management Relations Act and the strong federal policy favoring arbitration, the Court overruled Sinclair. The Court found it essential to recognize an exception to the anti-injunction provisions for cases in which the employer sought to enforce the Union's contractual obligation to arbitrate grievances rather than to strike over them. Jacksonville Bulk Terminals v. International Longshoremen's Association, 102 S.Ct. at 2679 (1982)
 
 
 [8]
 While recognizing the concept of coterminous interpretation, the Third Circuit crystallized the significance of Buffalo Forge as follows:
 The relevance of Buffalo-Forge is the recognition that, absent some evidence to the contrary, the quid pro quo theory underlying coterminous interpretation applies where there is an express no-strike clause in the contract. Normally, the employer will not agree to arbitration unless he gets an agreement from the union that it will not strike over those arbitrable issues. In addition, in the normal case the union will not agree to a no-strike clause that extends beyond the arbitration clause.
 Delaware Coca-Cola, 624 F.2d at 1186.
 
 
 [1]
 This fact eviscerates the Union's impassioned portrait of the strike as the only means of rescuing the drivers from "unconstitutional" custody
 
 
 [2]
 Which provides:
 No court of the United States shall have jurisdiction to issue any restraining order or temporary or permanent injunction in any case involving or growing out of any labor dispute to prohibit any person or persons participating or interested in such dispute (as these terms are herein defined) from doing, whether singly or in concert, any of the following acts:
 (a) Ceasing or refusing to perform any work or to remain in any relation of employment.
 29 U.S.C. Sec. 104.
 
 
 [3]
 Similar disputes had in fact been arbitrated under the procedures set in the collective bargaining agreements